IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

SINGING RIVER HEALTH SYSTEM
A/K/A SINGING RIVER HOSPITAL
SYSTEM                                                                        PLAINTIFF

VS.                                                    CIVIL ACTION NO. 3:15 CV 36 HTW LRA

KPMG LLP                                                                      DEFENDANT

*[Filing stamp: SOUTHERN DISTRICT OF MISSISSIPPI FILED JAN 16 2015 ARTHUR JOHNSTON DEPUTY BY___]*

## COMPLAINT

Plaintiff Singing River Health System alk/a Singing River Hospital System ("Singing River")
files this complaint against KPMG LLP ("KPMG") and demands a trial by jury.

### INTRODUCTION

1.    Financial audits are designed to provide an objective and independent analysis of an
institution's financial statements to provide reasonable assurances that the financial statements are
presented fairly and in accordance with generally accepted accounting principles.

2.    Audit opinions provide institutions essential information, objective analysis, and
accountability.

3.    Singing River retained a national audit, tax and advisory accounting firm, KPMG, to
conduct annual audits of its financial statements, which KPMG agreed to conduct under exacting
standards of professional diligence.

4.    KPMG failed to conduct its audits by discharging its contractual and professional
duties, thereby proximately causing Singing River damages, set forth in this Complaint and leaving
Singing River with a massive financial deficit, a cripplingly underfunded pension plan, defending
multiple lawsuits brought by members of its pension plan, and out of compliance with its bond
covenants.

**PARTIES**

5.    Plaintiff Singing River is a county-owned community health system and a public subdivision of Jackson County, Mississippi, organized in accordance with the community hospital statutes of the State of Mississippi, Miss. Code. Ann. § 41-13-1 *et. seq.*, with its principal place of business in Pascagoula, Jackson County, Mississippi.

6.    Defendant KPMG is one of the largest audit, tax, and advisory firms in the United States. KPMG is a member of KPMG International Cooperative, which has its global headquarters in Amstelveen, Netherlands.

7.    KPMG is incorporated in the State of Delaware, has its national headquarters at 345 Park Avenue, New York, New York, 10154, and does business in Hinds County. KPMG may be served with process and a copy of this Complaint by serving its registered agent for service of process at Corporation Trust Company, 1209 Orange Street, Wilmington, Delaware, 19801. KPMG maintained an office in Jackson, Mississippi at all times relevant to this lawsuit, and maintains an office in Jackson today at One Jackson Place 188 East, Capitol Street, Jackson Mississippi 39201. That office performed most of the work at issue in this Complaint.

**JURISDICTION AND VENUE**

8.    This Court has subject matter jurisdiction under 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.

9.    This Court has personal jurisdiction over KPMG because this action arose from, and is connected with, KPMG's purposeful acts committed in Mississippi. KPMG has continuous and systematic activities in the State of Mississippi and maintains an office in Jackson, Mississippi,

which is the office that performed most of the work for Singing River. KPMG directly and intentionally transacted business in this district with respect to the matters at issue in this lawsuit. A substantial part of the events giving rise to and at issue in this lawsuit occurred in this district.

10.     Venue is proper in this district under 28 U.S.C. §1391(b) because a substantial part of the events giving rise to this lawsuit occurred in this district.

## BACKGROUND

11.     Singing River is a county-owned community health system and a public subdivision of Jackson County, Mississippi, organized in accordance with the community hospital statutes of the State of Mississippi, Miss. Code. Ann. § 41- 13-1 *et. seq.*

12.     Singing River operates two hospitals in Jackson County, Mississippi: Singing River Hospital in Pascagoula, and Ocean Springs Hospital in Ocean Springs, as well as medical clinics along the Gulf Coast.

13.     Singing River is the second largest employer in Jackson County, employing approximately 2400 employees, including nearly 300 physicians on its medical staff.

14.     Singing River is an important influence on the local economy in Jackson County. In 2013, Singing River (directly and indirectly) generated an approximate $27 million in local wages, $150 million in local retail sales, and $1 million in local sales tax in Jackson County.

15.     Singing River fulfills a vital community role by providing essential health services to Jackson County residents. Singing River operates the only community hospitals in Jackson County. In 2013, over 100,000 people visited Singing River's emergency rooms and over 85,000 people visited Singing River's clinics. Singing River's staff performed approximately 1.4 million outpatient procedures in 2013, and cared for over 18,000 inpatient Jackson County residents.

- 3 -

## A.   KPMG Audits Singing River's Financial Statements since 1978

16.   KPMG (and its predecessor firm, Peat Marwick) has been auditing Singing River's financial statements for approximately thirty-four (34) years-since 1978.

17.   KPMG and Singing River have written agreements for financial statement auditing services in a series of Engagement Letters.

18. The Engagement Letter dated May 8, 2008 ("May 8, 2008 Engagement Letter") was executed by Ashley Willson, a KPMG partner who works from KPMG's Jackson, Mississippi office, and Michael Crews, Singing Rivers' former Chief Financial Officer.

19.   Pursuant to that agreement, KPMG agreed that "[w]e will issue a written report upon our audit of the System's financial statements, including OMB Circular A-133 audit services, as of and for the year ending September 30, 2008."

20.   The May 8, 2008 Engagement letter provided that:

> Pursuant to our arrangement as reflected in this letter we will provide the services set forth in this letter for each of its subsequent fiscal years until either the Board of Trustees or we terminate this agreement, or mutually agree to the modification of its terms. The fees for each subsequent year will be annually subject to negotiation and approval by the Board of Trustees.

> May 8, 2008 Engagement Letter.

21.   Each subsequent year through 2012, KPMG and Singing River reconfirmed their agreement for that year's financial statement auditing and executed an amended Engagement Letter with the same essential terms.

22.   Pursuant to each Engagement Letter, KPMG agreed that:

> We will issue a written audit report upon our audit of the System's financial statements, including OMB Circular A-133 audit services,

- 4 -

> as of and for the year ending September 30, 2008. <u>We have the</u>
> <u>responsibility to conduct and will conduct the audit of the financial</u>
> <u>statements in accordance with auditing standards generally accepted</u>
> <u>in the United States of America and the standards for financial audits</u>
> <u>contained in *Government Auditing Standards*, issued</u> by the
> Comptroller General of the United States, with the objective of
> expressing an opinion as to whether the presentation of the financial
> statements conforms with U.S. generally accepted accounting
> principles.
>
> In conducting the audit, we will perform tests of the accounting
> records and such other procedures, as we consider necessary in the
> circumstances, to provide a reasonable basis for our opinion on the
> financial statements. We also will assess the accounting principles
> used and significant estimates made by management, and evaluate the
> overall financial statement presentation.
>
> May 8, 2008 Engagement Letter (*emphasis added*).

23. Under the explicit terms of the Engagement Letters, KPMG affirmed what it was already obligated to do under the standards guiding its profession-to perform its accounting duties in accordance with auditing standards generally accepted in the United States of America, and the standards for financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States.

24. Generally Accepted Auditing Standards ("GAAS") are standards against which the quality of audits are performed and measured. In the United States, those standards are promulgated by the Auditing Standards Board, which is a division of the American Institute of Certified Public Accountants. *See Codification of Accounting Standards and Procedures, Statement on Auditing Standards No.1*, § 150 (Am. Inst. of Certified Pub. Accountants 1972).

25. Under GAAS, "[t]he auditor must exercise due professional care in the performance of the audit and the preparation of the report," and "[t]he auditor must obtain sufficient appropriate

- 5 -

audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit." *Id.* § 0.2.

26.     Generally Accepted Government Auditing Standards ("GAGAS") are standards against which the quality of audits of government entities are performed and measured. Those standards are promulgated by the Government Accountability Office, headed by the Comptroller General of the United States. *See* Comptroller General of the United States, *Government Auditing Standards* (2011).

27.     Under GAGAS:

> 3.60 Auditors must use professional judgment in planning and performing audits and in reporting the results.
>
> 3.61 Professional judgment includes exercising reasonable care and professional skepticism. Reasonable care includes acting diligently in accordance with applicable professional standards and ethical principles. Professional skepticism is an attitude that includes a questioning mind and a critical assessment of evidence.
>
> Professional skepticism includes a mindset in which auditors assume neither that management is dishonest nor of unquestioned honesty.
>
> 3.62 Using the auditors' professional knowledge, skills, and experience to diligently perform, in good faith and with integrity, the gathering of information and the objective evaluation of the sufficiency and appropriateness of evidence is a critical component of audits. Professional judgment and competence are interrelated because judgments made are dependent upon the auditors' competence.

> *Id.*

28.     Generally Accepted Accounting Principles ("GAAP") refers to the standard framework of guidelines for financial accounting, including the standards, conventions, and rules accountants must follow, published by the Financial Accounting Standards Board. Auditors

conducting audits under the standards in GAAS and GAGAS must certify that the financial statements are fairly presented in accordance with GAAP.

29.     Under GAAP's revenue recognition principle, losses must be recognized when their occurrence becomes probable. See Research and Dev. Arrangements, Statement of Fin. Accounting Standards No. 168 (Fin. Accounting Standards Bd. 2009).

30.     Pursuant to the Engagement Letters, KPMG issued an audit report each year, stating each year that:

> [I]n our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Singing River Health System ... and the changes in its financial position and its cash flows for the years then ended, in conformity with U.S. generally accepted accounting principles ... and certifying that KPMG's audit complied with the standards required under GAAS andGAGAS.
>
> *See, e.g.*, KPMG's Independent Auditor's Report dated June 21, 2013 at 16.

31.     In fact, as described below, KPMG's audits were negligently riddled with error, and did not employ GAAP, in breach of the standards imposed on KPMG by GAAS and GAGAS.

32.     Singing River paid KPMG well over $200,000 annually in fees and expenses for its financial statement auditing services, as follows:

- Singing River paid KPMG a total of $242,658 for its financial statement audit for fiscal year ending September 30, 2008;
- Singing River paid KPMG a total of $262,544 for its financial statement audit for fiscal year ending September 30, 2009;
- Singing River paid KPMG a total of $285,813 for its financial statement audit for fiscal year ending September 30, 2010;
- Singing River paid KPMG a total of $299,329 for its financial statement audit for fiscal year ending September 30, 2011; and

- 7 -

• Singing River paid KPMG a total of $376,069 for its financial statement audit for fiscal year ending September 30, 2012.

33.     The sum of these auditing fees for the years 2008-2012 exceeded $1.4 million.

34.     As described below, each of the aforementioned financial statement audits was conducted negligently and well below the standards required by GAAS and GAGAS that KPMG exercise in conducting its audits.

**B.      KPMG's Erroneous and Sub-Standard Audits are Revealed to Have a Staggering Revenue Overstatement and Require an $88 Million Adjustment to Financial Statements**

35.     In 2013, after KPMG had conducted some preliminary field work for that year's audit (costing Singing River $50,000), Singing River decided, as a cost-saving measure, to hire Horne LLP ("Horne") to conduct its fiscal year 2013 audit instead.

36.     Horne's field work in preparation for its audit of Singing River's financial statements revealed that KPMG's prior audits were riddled with flagrant accounting errors that had resulted in a colossal overstatement of Singing River's accounts receivable by approximately $88 million.

37.     Around the same time, Lee Bond, former Executive Director of Finance and now Chief Financial Officer of Singing River, was asked to review Singing River's bad debt accounts as part of his ongoing analysis of various Singing River programs.

38.     Upon Bond's review, the bad debt accounts appeared misstated. After further analysis, he came to the conclusion, as did Horne, that KPMG's annual audits had been egregiously flawed and had resulted in an $88 million overstatement: approximately $27 million from 2012, and approximately $61 million from previous years.

39.     Although KPMG had a duty to exercise due professional care in its performance of the audits under GAAS and GAGAS, and employing GAAP, Horne and Bond's analysis revealed

that KPMG's annual financial audits were negligently erroneous and far below any standard of reasonable professional judgment.

40.    Specifically, and illustratively, not exhaustively, KPMG breached its professional duties in some of the following ways:

- KPMG was exceedingly overly optimistic in its estimate of amounts that would be collected by Singing River's Patient Financial Services and made basic calculation errors. In KPMG's calculations of the department's collection rate, instances of patient death or bankruptcy (which obstruct account collection) were removed from the denominator (the universe of possible collections), but left in the numerator (the amounts actually collected), which had the effect of assuming collection while failing to discount for non-collection;

- KPMG commingled Patient Financial Services bad debt recoveries with the department's collection from "good/unaged" accounts, thus vastly overstating the amounts properly categorized as bad debt recoveries and concealing the much lower rate. KPMG could have easily avoided this error by reviewing the run rate (dollars actually collected per month) for bad debt accounts;

- KPMG erroneously credited an inflated $50 million in anticipated bad debt recovery, as described above, and combined it with $5 million in actual annual historical recovery, effectively double counting bad debt recoveries;

- KPMG used a five-year overall calculation in its 2011 and 2012 audits, assuming collection rates at the same rate as earlier years (e.g., 2008), when, in fact, Singing River's collection rates had deteriorated markedly in subsequent years;

- KPMG distorted the allowance rate in its calculation of Singing River's allowance for doubtful accounts. The correct applicable rate was approximately 83%, which would have been revealed by testing all the subsequent balances by comparing the previous year's gross receivables to what was subsequently collected. Nonetheless, KPMG did not test the balances sufficiently, and used an incorrect rate of 79%, without taking proper steps, required by its profession, to corroborate it;

- KPMG calculated Singing River's reserves based only on closed/settled accounts (i.e., those accounts that have been successfully worked and closed) and excluded accounts that historically remained open or unsettled, thereby artificially inflating Singing River's net receivables;

- KPMG allowed credit for Disproportionate Share Hospital ("DSH") payments, a government payment intended to subsidize treating Medicare and Medicaid patients, as bad debt collection, although DSH applies generally and not to particular patient accounts, as well as accruing DSH payments as a receivable elsewhere, effectively crediting DSH payments twice; and

- KPMG allowed credit for Executive Health Resources ("EHR") recoveries of Recovery Audit Contractor ("RAC") recoupments (funds Singing River regained after confiscation by Medicare and Medicaid auditors) as both bad debt collection and a receivable, effectively crediting EHR recoveries twice.

41. GAAS requires an auditor to "exercise due professional care in the performance of the audit and the preparation of the report" and "obtain sufficient appropriate audit evidence by performing audit procedures to afford a reasonable basis for an opinion regarding the financial statements under audit." *See Codification of Accounting Standards and Procedures, Statement on Auditing Standards No.1*, § 150 (Am. Inst. of Certified Pub. Accountants 1972).

42. GAGAS requires an auditor to "use professional judgment, "exercise reasonable care and professional skepticism ... diligently in accordance with applicable professional standards and ethical principles," and "diligently perform, in good faith and with integrity, the gathering of information and the objective evaluation of the sufficiency and appropriateness of evidence." *See* Comptroller General of the United States, *Government Auditing Standards* §§ 3.60-3.62 (2011).

43. GAAP's revenue recognition principle holds that losses must be recognized when their occurrence becomes probable. See Research and Dev. Arrangements, Statement of Fin. Accounting Standards No. 168 (Fin. Accounting Standards Bd. 2009).

44. Although KPMG agreed, and had a professional duty, to conduct its audits pursuant to the standards expressed in GAAS and GAGAS, employing GAAP, its audits did not employ GAAP, were woefully inadequate, replete with inexcusable computational error and incorrect

- 10 -

assumptions, far short of the standards expressed in GAAS and GAGAS, and performed in breach of its professional and contractual duties.

45. Although KPMG agreed in the Engagement Letters that "[it] will perform tests of the accounting records and such other procedures, as we consider necessary in the circumstances, to provide a reasonable basis for our opinion on the financial statements," KPMG violated standards of its profession and its contract with Singing River by, among others, not performing the basic tests necessary to substantiate its opinions.

46. Auditors are the public's watchdogs; they are charged with ferreting out errors and inaccuracies in financial statements so that clients and third parties can rely on financial statements. KPMG's abject, egregious failures in auditing Singing River's financial statements led to an $88 million adjustment, one of the largest reported adjustments in history, and should have been, would have been, and was ultimately detected by a competent auditor.

47. In fact, a recent inspection of KPMG's audits by audit regulator Public Company Accounting Oversight Board ("PCAOB") revealed that KPMG's audits have continuing and pervasive quality control issues.[1] PCAOB's latest inspection report, released in October 2014, made public that 46% of KPMG's reviewed audits were deficient. The regulator also unsealed some of its previously confidential criticism of KPMG's quality controls, divulging that KPMG's personnel have "failed to sufficiently evaluate 'contrary evidence' that seemed to contradict its audit conclusions."[2]

---

[1]

Michael Rapoport, *KPMG Audits Had 46% Deficiency Rate in PCAOB Inspection*, Oct. 23, 2014, *Wall St. J.*, available at http:// http://www.wsj.com/articles/kpmg-audits-had-46-deficiency-rate-in-pcaob-inspection-1414093002.

[2] *Id.*

The *Wall Street Journal* reported that, "The unsealing amounts to a public rebuke to KPMG for not acting quickly enough to fix quality-control problems, in the regulator's view."[3]

48.     GAAS and GAGAS require an auditor to exercise reasonable care and professional judgment. KPMG's audits were unreasonable and careless.

49.     GAAP's revenue recognition principle holds that losses must be recognized when their occurrence becomes probable, but KPMG allowed Singing River's probable losses to go unrecognized.

50.     GAAS and GAGAS require an auditor to diligently gather information, evaluate evidence, and perform audit procedures that afford a reasonable basis for an opinion. KPMG made unreasonable assumptions and careless errors, and failed to perform necessary tests that would have revealed its flawed calculations. A professional, diligent auditor would have performed those tests, as he or she is required to do by auditor professional standards.

51.     Although KPMG represented to Singing River that it would abide by the standards in GAAS and GAGAS, and employ GAAP, in performing its work, KPMG negligently botched its audits, in breach of both its contractual and professional duties.

## C.     KPMG Refuses to Acknowledge or Correct Its Errors or Withdraw its Erroneous "Clean" Opinions

52.     On March 27, 2014, Singing River's newly appointed CFO, Bond, and Horne's auditors spoke by conference call to Willson and David Langston, who also worked on KPMG's Singing River account.

---

[3]*Id.*

- 12 -

53.     Bond and Home's auditors alerted Willson and Langston to the serious errors in their previous audits of Singing River's financial statements, and asked them to restate their audit conclusions, withdrawing their "clean" opinions and correcting the egregious errors in the financial statements.

54.     Willson and Langston refused. Perhaps it is not surprising that KPMG refused to do so, as the withdrawal and restatement of its opinions would be an admission of its failures to comply with the standards guiding its profession.

55.     The next day, Langston emailed Bond that, "after considering the applicable auditing standards ... and generally accepted accounting standards, you have not provided us with any new information that would indicate that our auditors' report on the System's 2012 financial statements should no longer be relied on." Email dated March 28, 2014, from D. Langston to L. Bond re: 2012 Audit.

56.     To account for the $88 million overstatement in accounts receivable, Home's auditors adjusted the beginning balance of 2013.

57.     Singing River paid Home $50,000 to adjust and correct KPMG's erroneous audits.

    **D.     KPMG's Negligent Audits Proximately Caused Damages to Singing River**

58.     As a direct and proximate result of KPMG's negligent, inadequate audits, concealing Singing River's true financial condition, Singing River is damaged.

59.     Singing River paid KPMG more than $1.4 million between 2008 and 2012 for financial statement auditing that was negligently deficient and in contradiction of KPMG's contractual duties.

- 13 -

60.     Singing River paid Horne $50,000 to adjust KPMG's erroneous calculations.

61.     Singing River maintains a pension plan (the "Plan"), which is a single-employer defined benefit pension plan sponsored and administered by Singing River that covers full-time employees who were hired before October 1, 2011.

62.     The plan is funded through employee and employer contributions, as well as market returns on plan assets.

63.     However, it has now been discovered that the Plan has been underfunded during the years that KPMG provided auditing services to Singing River, a fact that was masked by KPMG's negligent audits, and currently remains underfunded by approximately $150 million.

64.     Singing River is not financially able to fund the plan and has now been forced to incur the burden and expense of defending multiple lawsuits, brought by members of its pension plan, in light of the plan's underfunding.

65.     Had KPMG conducted its audits in discharge of its professional duties and auditing and accounting standards that guide its profession, Singing River would have known about the serious underfunding problem far sooner, and could have acted on that information before the disastrous consequences that it now faces.

66.     In 2009 and 2011, Singing River completed bond transactions to finance various improvements to Ocean Springs Hospital and Singing River Hospital. The bonds were issued by Mississippi Development Bank and insured by Assured Guaranty Municipal Corporation ("Assured Guaranty").

67.     The Bond Covenants between Singing River and its lenders require that Singing River maintain cash available for debt service, a ratio that measures the amount of cash a company has on

hand as compared to its debt service obligations, at 120 (one hundred and twenty) percent of Singing River's maximum annual debt service requirement (the "Rate Covenant").

68.     The Bond Covenants between Singing River and its lenders require that Singing River maintain sixty-five (65) days cash on hand, the number of days of operating expenses an organization can pay with its current available cash (the "Liquidity Covenant").

69.     It has now come to light that Singing River has not been and is not in compliance with the Rate Covenant or the Liquidity Covenant, which was masked by KPMG's negligently faulty audits.

70.     Singing River has obtained a waiver of the Rate Covenant and the Bond Covenant from Assured Guaranty, but its position *vis-a-vis* its lenders is therefore tenuous and has caused and continues to cause ongoing damages to Singing River.

71.     For example, but not exhaustively, to sufficiently address the complications resulting from Singing River's noncompliance with the Bond Covenants, it was necessary for Singing River to hire an outside management consultant, FTI Consulting ("FTI"), to assist Singing River in working to satisfy the Bond Covenant requirements and to secure the waiver from Assured Guaranty.

72.     Singing River paid FTI approximate $216,593 for its services.

73.     The fees incurred to pay FTI are merely illustrative, and Singing River's damages flowing from its noncompliance with the Bond Covenants due to KPMG's negligent audits are ongoing and continue to accrue.

74.     Had KPMG conducted its audits in compliance with its professional obligations, Singing River would have known it was in danger of falling out of compliance with the Bond Covenants, and could have acted sooner to rectify the problem, thereby avoiding and/or minimizing the damages that proximately flow from KPMG's negligence and breach of contract.

- 15 -

75.     KPMG had a contractual and a professional duty to perform its audits diligently, pursuant to the principles expressed in GAAS and GAGAS, employing GAAP, as well as other standard and reasonable practices, accepted in the industry in the conduct of an audit of a health care entity.

76.     But KPMG's audits were negligent and sub-standard, thereby proximately causing damages to Singing River, as set forth in this Complaint.

77.     KPMG intended for its work to be relied on by Singing River, and Singing River did rely on it. Singing River would not have paid more than $1.4 million for inadequate audits, underfunded its pension plan, or fallen out of compliance with the Bond Covenants if KPMG had acted competently and without negligence, and performed its contractual duties.

## CAUSES OF ACTION

Count I - Breach of Contract

78.     Singing River incorporates the allegations above as if fully set forth herein.

79.     Pursuant to the Engagement Letters, KPMG agreed:

> We have the responsibility to conduct and will conduct the audit of the financial statements in accordance with auditing standards generally accepted in the United States of America and the standards for financial audits contained in Government Auditing Standards, issued by the Comptroller General of the United States.

80.     "In conducting the audit, we will perform tests of the accounting records and such other procedures, as we consider necessary in the circumstances, to provide a reasonable basis for our opinion on the financial statements."

81.     KPMG breached its contractual obligations by failing to comply with the professional standards expressed in GAAS and GAGAS, and employing GAAP. Those failures include, but are not limited to:

- 16 -

- Artificially inflating Patient Financial Services' collection rate by removing patient deaths and bankruptcies from the denominator while leaving them in the numerator, effectively assuming collection while failing to discount for noncollection.

- Commingling bad debt recoveries with collection from "good/unaged" accounts, vastly overstating the amount properly categorized as bad debt recoveries, an error that could have been avoided by reviewing the run rate for bad debt accounts.

- Effectively counting bad debt recoveries twice by combining the inflated bad debt recovery figure with the actual historical recovery.

- Using a five year overall calculation instead of using current less favorable trends.

- Distorting the allowance rate in the calculation of allowance for doubtful accounts, while could have been avoided had KPMG bothered to sufficiently test the balances.

- Calculating the reserves based only on closed/settled accounts instead of all accounts, artificially inflating the net receivables.

- Allowing DSH payments to be credited erroneously as bad debt collection and also as a receivable, effectively crediting them twice.

- Allowing EHR recoveries of RAC recoupments to be credited as both bad debt collection and a receivable, effectively crediting them twice.

82.    GAAS and GAGAS, which are required in the Engagement Letters, require an auditor

to exercise reasonable care and professional judgment. KPMG's audits failed to comply with

those standards and were negligent, unreasonable and careless.

83.    GAAP's revenue recognition principle holds that losses must be recognized when

their occurrence becomes probable, but KPMG allowed Singing River's probable losses to go

unrecognized.

- 17 -

84.     GAAS and GAGAS, which are required in the Engagement Letters, require an auditor to diligently gather information and evaluate evidence, and perform audit procedures that afford a reasonable basis for an opinion. The Engagement Letters require KPMG to perform necessary tests to support its opinions. KPMG made unreasonable assumptions and careless errors, and failed to perform required testing that would have revealed its flawed calculations. A professional, diligent auditor would have performed those tests.

85.     KPMG failed to perform its audits under the standards expressed in GAAS and GAGAS, employing GAAP, which constitutes breach of its contractual duties. As a direct, proximately, and foreseeable result of KPMG's breach, Singing River has suffered actual damages and will continue to suffer damages in an amount to be proven at trial.

## COUNT II - NEGLIGENCE AND PROFESSIONAL MALPRACTICE

86.     Singing River incorporates the allegations above as if fully set forth herein.

87.     KPMG owed Singing River a duty to use the skill, prudence, and diligence as other reasonable and prudent auditors would use in similar circumstances, as expressed in the standards articulated in GAAS and GAGAS, employing GAAP. That duty encompassed KPMG's work and reporting concerning Singing River's financial condition.

88.     KPMG engaged in negligence and professional malpractice by breaching its duties through its numerous and persistent errors and failures to act in accordance with its professional responsibilities, including but not limited to:

- •     Artificially inflating Patient Financial Services's collection rate by removing patient deaths and bankruptcies from the denominator while leaving them in

- 18 -

the numerator, effectively assuming collection while failing to discount for noncollection.

- Commingling bad debt recoveries with collection from "good/unaged" accounts, vastly overstating the amount properly categorized as bad debt recoveries, an error that could have been avoided by reviewing the run rate for bad debt accounts.

- Effectively counting bad debt recoveries twice by combining the inflated bad debt recovery figure with the actual historical recovery.

- Using a five year overall calculation instead of using current less favorable trends.

- Distorting the allowance rate in the calculation of allowance for doubtful accounts, while could have been avoided had KPMG bothered to sufficiently test the balances.

- Calculating the reserves based only on closed/settled accounts instead of all accounts, artificially inflating the net receivables.

- Allowing DSH payments to be credited erroneously as bad debt collection and also as a receivable, effectively crediting them twice.

- Allowing EHR recoveries of RAC recoupments to be credited as both bad debt collection and a receivable, effectively crediting them twice.

89.    GAAS and GAGAS call for an auditor to exercise reasonable care and professional judgment. KPMG's audits were unreasonable and careless.

90.    GAAP's revenue recognition principle holds that losses must be recognized when their occurrence becomes probable, but KPMG allowed Singing River's probable losses to go unrecognized.

91.    GAAS and GAGAS call for an auditor to diligently gather information and evaluate evidence and perform audit procedures that afford a reasonable basis for an opinion. KPMG made unreasonable assumptions and careless errors, and failed to perform simple tests that would have revealed its flawed calculations. A professional, diligent auditor would have performed those tests.

92.    Singing River reasonably and justifiably relied on KPMG's negligent advice.

93.    As a direct, proximate, and foreseeable result of KPMG's negligence and breaches of its duties, Singing River has suffered and will continue to suffer substantial actual damages in an amount to be proven at trial.

## JURY DEMAND

94.    Singing River requests a jury trial in this action.

## RELIEF SOUGHT

95.    Singing River respectfully requests that this Court enter judgment in favor of Singing River and against KPMG, and award Singing River actual damages and all such other and further relief, equitable and legal, to which Singing River is justly entitled.

RESPECTFULLY SUBMITTED, this the _16th_ day of _January_, 2015.

**SINGING RIVER HEALTH SYSTEM
A/K/A SINGING RIVER HOSPITAL
SYSTEM**

BY: _____ / JAW
    OF COUNSEL

EDWARD C. TAYLOR - BAR #9043
etaylor@danielcoker.com
DANIEL COKER HORTON AND BELL, PA
1712 15TH STREET, SUITE 400
POST OFFICE BOX 416
GULFPORT, MS 39502-0416
TELEPHONE:  (228) 864-8117
FACSIMILE:   (228) 864-6331

- 20 -

TERRY R. LEVY - BAR #1225
tlevy@danielcoker.com
DANIEL COKER HORTON AND BELL, PA
4400 OLD CANTON ROAD, SUITE 400
POST OFFICE BOX 1084
JACKSON, MISSISSIPPI 39215-1084
TELEPHONE: (601) 969-7607
FACSIMILE: (601) 969-1116

*Attorneys for Plaintiff Singing River*